UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KIMBERLY CARPENTER, et al., | : | |
|      Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 12-607ML |
| | : | |
| HARTFORD FIRE INSURANCE | : | |
| COMPANY, | : | |
|      Defendant. | : | |

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

     Plaintiff Kimberly Carpenter, her husband and two children (collectively "Plaintiffs") seek full compensation for the catastrophic injuries Mrs. Carpenter suffered in an automobile crash caused by an underinsured motorist while she was driving a car leased and insured by her employer, Quintiles Transnational Corp. ("Quintiles"). Having settled with the underinsured tortfeasors for the full amount of available coverage, Plaintiffs now seek underinsured motorist ("UIM") coverage from Defendant Hartford Fire Insurance Company ("Hartford"), the issuer of Quintiles' liability insurance policy. Hartford has proffered payment of $75,000, the applicable UIM statutory minimum, which it contends is the limit of the UIM coverage that Quintiles purchased. Plaintiffs rejected this proffer based on their legal argument that, because Quintiles did not properly select minimal UIM coverage, by operation of law, Hartford is on the hook for the full UIM default limit, which must equal the bodily injury liability limit of $2 million under the Quintiles policy.

Before me for report and recommendation are the parties' cross-motions for summary judgment.[1]  ECF Nos. 11, 15.

Plaintiffs focus on the unambiguous requirement in the Rhode Island statute that compels the insurer to have its insured make the selection of less than the full limit of UIM coverage in writing.  They ask this Court to hold that, despite the undisputed evidence of Quintiles' intent to purchase the lowest limit permissible ($75,000), Hartford's failure to procure a correct selection form – instead accepting one that mistakenly selected an option (no UIM coverage) prohibited by Rhode Island law – voided the selection so the policy reverts to the default coverage limit of $2 million.  They also argue that Hartford failed to give timely notice to Quintiles of its UIM options.

Hartford counters that Quintiles' clearly expressed its intent to purchase the minimum UIM limit permissible under Rhode Island law, that Hartford properly interpreted its intent despite an error on the selection form and that there was a meeting of the minds between insurer and insured regarding the meaning of Quintiles' written selection.  Accordingly, Hartford contends, its issuance of an endorsement providing for the minimum limit of UIM coverage ($75,000) is enforceable under Rhode Island law.  Hartford further argues that its allegedly belated submission of the UIM notice after the effective date of the policy is legally immaterial.

The First Circuit has recently addressed a district judge's attempt to interpret the Rhode Island UIM coverage statute regarding the timing of the UIM claim, a topic on which there was a dearth of controlling precedent; it held that the better course for resolving such a question that implicates important state policy considerations is to certify it to the Rhode Island Supreme

---

[1] Plaintiffs' motion is for partial summary judgment on Count II of their Complaint, which seeks declaratory judgment regarding the amount of UIM coverage available through the Hartford policy.  They have not moved on Count I, which seeks coverage up to the UIM policy limits.  Hartford moves for summary judgment as to both counts.

Court.  See Am. States Ins. Co. v. LaFlam, 672 F.3d 38 (1st Cir. 2012) (certified question answered, 69 A.3d 831 (R.I. 2013)).  While such an option is tempting for this case, with the comprehensive explication of the operative public policy considerations set out in the Supreme Court's answer to the certified question in LaFlam, I conclude that Rhode Island decisions, supplemented by guidance from "persuasive adjudications by courts of sister states [and] learned treatises," provides more than adequate guidance to permit this Court to make an informed prophecy of what the Rhode Island Supreme Court would do if facing the same question. Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996); Henry v. Sheffield, 856 F. Supp. 2d 345, 350 (D.R.I. 2012).  Accordingly, based on the following analysis, I recommend that Plaintiffs' Motion for Partial Summary Judgment (ECF No. 11) be denied and Hartford's Motion for Summary Judgment be granted (ECF No. 15).

## I.     FACTS[2]

On August 22, 2007, while driving a company-leased car in connection with her work for Quintiles, Mrs. Carpenter was side-swiped by a driver negligently operating a vehicle owned by Willow Tree Landscaping, Inc.  ECF No. 17 ¶ 14.  Plaintiffs sued Willow Tree and the driver; the suit settled for $500,000, the maximum limits of Willow Tree's liability policy.  Id. ¶ 15. Plaintiffs then turned to Hartford for additional compensation under the UIM coverage provided by Quintiles' liability policy.  Id. ¶ 16.  Hartford offered $75,000, which it maintains is the policy limit for Quintiles' UIM coverage.  The parties do not dispute that the Willow Tree

---

[2] Except as noted, these facts are drawn from the parties' statements of undisputed facts and the other unrebutted evidence submitted in connection with these motions.

settlement, combined with the $75,000 offered by Hartford, is less than the full amount of

Plaintiffs' damages potentially compensable under Hartford's UIM coverage.[3]

Mrs. Carpenter's employer, Quintiles, is a large multi-national biotech and

pharmaceutical company that leases and owns vehicles throughout the United States.  The

undisputed evidence establishes that Quintiles enlisted Aon Risk Services of Pennsylvania

("Aon") to serve as its insurance broker in connection with the renewal of its primary casualty

and umbrella/excess casualty insurance for Quintiles' domestic operations, including those in

Rhode Island.  ECF No. 16-1 at 2, 6; ECF No. 16-3 ¶¶ 4, 6.  Aon and Quintiles prepared, and

Aon, acting for Quintiles, submitted to Hartford, a "Primary/Excess Casualty Submission" (the

"Policy Submission") that outlined Quintiles' needs and preferences for insurance coverage

throughout the United States for the policy period from April 1, 2007, through April 1, 2008.[4]

ECF No. 13 ¶ 8; ECF No. 16-3 ¶¶ 4-5.  The purpose of the Submission was to get "an insurance

quote for Quintiles insurance program, including uninsured motorist bodily injury coverage;"

qualified insurance carriers were asked to submit quotes by March 14, 2007.  ECF No. 16-1 at 6;

ECF No. 16-3 ¶ 5.

The Policy Submission indicates that Quintiles wanted $2 million of "Liability -

Combined Single Limit" coverage for its business automobile liability insurance.  ECF No. 16-2

---

[3] At oral argument on the cross-motions for summary judgment, Hartford represented that it has offered $75,000,
which was rejected, and that it remains willing to pay $75,000, which would end this case if Quintiles' UIM
coverage is capped at that amount.  See ECF No. 3-1 at 2.  Hartford's counsel also represented "the only thing I can
tell you is that the case is certainly worth another $75,000 . . . I certainly agree that there's no question that this case
is certainly worth above the amount of money [Plaintiffs have] collected."

[4] While not disputing these facts, Plaintiffs claim that a "question of fact" remains with respect to "the extent to
which Quintiles participated in that process."  ECF No. 21 at 1.  This asservation does not raise a material factual
dispute.  See DRI LR Cv 56(a) (fact deemed admitted unless expressly denied or controverted).  Quintiles' unrefuted
affidavit, signed by its Senior Director of Global Risk Management, establishes that Aon was Quintiles' broker, that
both Aon and Quintiles prepared the Policy Submission and that the Submission accurately reflected Quintiles'
intent.  ECF No. 16-3 ¶¶ 4, 6, 10.  The extent of Quintiles' participation in the process is beside the point.  See Gen.
Accident Ins. Co. of Am. v. Am. Nat. Fireproofing, Inc., 716 A.2d 751, 756-57 (R.I. 1998) (when procuring
insurance for its principal, an insurance broker acts as that company's agent).

at 12.  The Submission also clearly and unambiguously expresses Quintiles' intent that,

consistent with applicable law in each state in which it did business, it wanted minimal UIM

coverage:

> **Uninsured/Underinsured Motorists Coverage**: For all states, where permitted
> to do so, the insured has elected to reject uninsured and/or underinsured motorists
> coverage.  In those states where the rejection of coverage is not permitted, the
> lowest permissible coverage limits apply.

ECF No. 16-2 at 15 (emphasis in original); see also id. at 12.

On April 3, 2007, a month before the policy issued, but two days after its effective date,

Hartford presented its responsive proposal regarding the Quintiles insurance program.  ECF No.

22-1.  With respect to UIM coverage, the proposal offered coverage of $2 million, the same as

the limit for automobile liability.  It also included a blank waiver form entitled "Supplemental

Application - Uninsured Motorists Coverage - Medical Payments Coverage - Your Choices in

Rhode Island" (the "Supplemental Application"). [5]  ECF 22-1 at 5-8; ECF No. 22 at 3-4.  This

form accurately notified Quintiles of its options regarding the selection of a lower limit for UIM

coverage[6] under Rhode Island law; it includes Hartford's recommendation that Quintiles opt for

UIM coverage at the same limit as its liability coverage ($2 million).  ECF No. 22-1 at 5.  It also

included check-boxes for Quintiles to select a lower limit or, if permitted by law, to completely

reject UIM coverage, and a blank for a signature from an authorized Quintiles representative to

---

[5] Plaintiffs' Statement of Undisputed Facts pegs the delivery of this form as occurring more than a month later, on May 22, 2007. ECF No. 13 ¶ 11.  Hartford's Reply asserts that the form was sent on April 3, 2007, as part of the proposal. ECF No. 22 at 3.  While Hartford neglected to incorporate this fact into an affidavit, it was not refuted by Plaintiffs; in any event, the difference is not material as the crux of Plaintiffs' belatedness argument is that the notice was sent after the effective date of the policy, a fact that is not disputed.  See ECF No. 12 at 7-8.

[6] Hartford flags a potential issue arising from its reference in the notice to "combined single limits" instead of the split limits contemplated by R.I. Gen. Laws § 31-31-7(a).  However, Plaintiffs do not contend that this potential error is material.  Cf. Melton v. Discover Prop. & Cas. Ins. Co., 760 F. Supp. 2d 633, 637-38 (W.D. Va. 2011) (error in description of minimum limits of UIM coverage immaterial where insured's selection clear).  In any event, its potential relevance is mooted by Hartford's ongoing willingness to pay the full $75,000.  This potential inaccuracy in the notice will not be discussed further in this report and recommendation.

make the selection.  Id. at 7-8.  Finally, it included standard language from the Rhode Island Department of Business Regulation informing Quintiles of its right to reject under certain circumstances or to select reduced UIM coverage in Rhode Island, including the dangers inherent in doing so.  Id. at 7.

On May 3, 2007, Hartford issued the Quintiles insurance policy, setting the premium at $467,325, with bodily injury liability coverage for business automobiles of $2 million.  ECF No. 13 ¶ 6, 10; ECF No. 14 at 2.  With respect to UIM coverage, the policy refers to a to-be-issued endorsement (Form HA2102).  ECF No. 14 at 3.  On May 22, 2007, Aon sent to Quintiles copies of Hartford's Supplemental Application waiver forms for all states, this time with a sample prepared by Aon that reflected Quintiles' intent as expressed in the Policy Submission to either reject UIM coverage outright or to select minimal UIM coverage consistent with applicable state law.  Id. at 62; ECF No. 16-3 at 2.  Quintiles was asked to review, sign and date the forms for each state, consistent with the sample, at its earliest convenience.  ECF No. 14 at 62.

Quintiles failed in its first attempt to return properly completed copies of the Supplemental Application forms.  ECF No. 16-3 at 2.  Aon brought the errors to its attention, and, on June 11, 2007, Quintiles returned the completed forms a second time, signed by Quintiles Senior Vice President John Goodacre.  ECF No. 16-2 at 29; ECF No. 16-3 at 2.  On the signed Supplemental Application waiver form for Rhode Island, the checked box reads:

> I reject [underinsured motorists coverage – bodily injury] coverage entirely (can only be rejected if the bodily injury liability insurance limit of my policy is the minimum limit required by Rhode Island Financial Responsibility Laws).

ECF No. 16-2 at 28.  This selection is legally impermissible because Quintiles' bodily injury liability coverage was well above the minimum limit; to comply with Rhode Island law while making a selection consistent with Quintiles' previously articulated intent, Quintiles should have

checked the box just above, which states, "[uninsured motorists bodily injury coverage] at the minimum limit required by Rhode Island Financial Responsibility Laws."  ECF No. 16-2 at 28; see R.I. Gen. Laws §§ 27-7-2.1(a), 31–31–7(a), 31-47-2(13)(i)(A).

When Hartford received the completed Supplemental Application form, marked with a choice legally impermissible under Rhode Island law, it did not return the form to Quintiles for a third time.  Instead, it interpreted the form so as to be consistent with Rhode Island law, ECF No. 16-1 ¶¶ 8-9, and with Quintiles' intent as articulated in the Policy Submission; accordingly, it issued the endorsement for UIM coverage in Rhode Island, Form HA2102, with a combined single limit of $75,000, the minimum limit allowed by Rhode Island law in light of Quintiles' bodily injury liability limit of $2 million.  See ECF No. 14 at 7-8 (listing UIM coverage for Rhode Island and twenty-four other states).  While Form HA2102 is undated, the undisputed facts permit the inference that it issued after Mr. Goodacre returned the signed selection form on June 11, 2007, and before the accident on August 22, 2007.  Compare Compl. Count II ¶ 4, ECF No. 1-2 ("the uninsured limits were $75,000 at the time of Mrs. Carpenter's accident"), with Answer Count II ¶ 3, ECF No. 3-1 ("defendant admits the allegations contained in paragraph 4"); see also ECF No. 13 ¶¶ 7, 13; ECF No. 17 ¶ 11.

It is undisputed that the $75,000 UIM coverage limit issued by Hartford for Quintiles in Rhode Island is consistent both with Quintiles' intent as expressed in its Policy Submission and its "intent for [underinsured motorists] coverage."  ECF No. 16-3 ¶ 10; ECF No. 17 ¶ 13.  Quintiles has never questioned or challenged its UIM coverage for Rhode Island as set out in Form HA2102.  ECF No. 16-3 ¶ 9; ECF No. 17 ¶ 12.

II.     **LAW**

A.     **Summary Judgment Standard**

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, discovery, disclosure materials and affidavits show there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006). A fact is material only if it possesses the capacity to sway the outcome; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000). The non-moving party "must present definite, competent evidence to rebut the motion." Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (internal citations omitted). Summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations or rank speculation. PHL Variable Ins. Co. v. P. Bowie 2008 Irrevocable Trust, 889 F. Supp. 2d 275, 279 (D.R.I. 2012) (quoting Ingram v. Brink's, Inc., 414 F.3d 222, 228–29 (1st Cir. 2005)).

The legal standard is the same when the parties have filed cross-motions for summary judgment. Adria Int'l Grp., Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). Cross-motions "simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." T.G. Plastics Trading Co. Inc. v. Toray Plastics (Am.), Inc., CA 09-336/M, 2013 WL 3974105, at *3 (D.R.I. Aug. 2, 2013) (quoting

Adria, 241 F.3d at 107).  This Court must view each motion separately in the light most

favorable to the non-moving party, draw all reasonable inferences in that party's favor and

determine, for each side, whether a judgment may be entered in accordance with the Rule 56

standard.  Bienkowski v. Ne. Univ., 285 F.3d 138, 140 (1st Cir. 2002); Wells Fargo Bank, N.A.

v. Wasserman, 893 F. Supp. 2d 310, 315 (D.R.I. 2012).

### B.    Underinsured Motorist Law

The Rhode Island General Assembly enacted the UIM statute,[7] R.I. Gen. Laws § 27–7–

2.1, to "require[] insurance carriers to provide protection for those claimants who voluntarily

contract with licensed carriers for liability coverage as against uninsured operators."  Am. States

Ins. Co. v. LaFlam, 69 A.3d 831, 835 (R.I. 2013) (quoting Henderson v. Nationwide Ins. Co., 35

A.3d 902, 906 (R.I. 2012)).  The interpretation of the statutes, regulations and policies relating to

UIM coverage has spawned considerable litigation in Rhode Island and across the country.

Henderson, 35 A.3d at 907 n.8 (citing 1 Alan I. Widiss & Jeffery E. Thomas, Uninsured &

Underinsured Motorist Insurance 14–15 (3d ed. 2005)).  Scholars suggest that the source of this

litigiousness is the lack of guidance provided by state legislatures.  Id.  Although nearly every

state has made UIM insurance mandatory in a general sense, few have chosen to define the

nature and extent of that mandate with much specificity.  Id.  In the resulting vacuum, resolving

thorny UIM coverage issues has become a task for courts.

In Rhode Island, the Supreme Court has established that "the public policy mandated by

the Legislature" is the beacon for construction of contracts for UIM coverage.  LaFlam, 69 A.3d

at 835.  While a primary purpose is to protect the insured against economic loss caused by

---

[7] The law controlling underinsured motorist coverage is the same as uninsured motorist coverage.  See R.I. Gen.
Laws § 27-7-2.1(g).  Since this case involves only underinsured motorist coverage, I use that term throughout this
report and recommendation.

underinsured or hit-and-run drivers, id.; DiTata v. Aetna Cas. & Sur. Co., 542 A.2d 245, 247 (R.I. 1988), Rhode Island's public policy is not one-sided – rather, courts must balance the goal of full recovery from losses caused by the operation of underinsured vehicles against the goal of protecting insurers from unwarranted claims.  LaFlam, 69 A.3d at 835 (citing Henderson, 35 A.3d at 906).  The Supreme Court has emphasized the need to adopt constructions that serve both these goals: "We must impose reasonable limitations on the extent that the uninsured-motorist statute is construed to protect an insured because public policy also dictates that we construe the statute 'in a manner that affords insurers some financial protection.'"  Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550, 553 (R.I. 1990) (quoting DiTata, 542 A.2d at 248).  Courts should avoid a UIM interpretation that would impose an "arguably onerous burden on insurers." See Ferreira v. Integon Nat. Ins. Co., 809 A.2d 1098, 1101 (R.I. 2002).

The other important guiding principle established by the Rhode Island Supreme Court is that an insurance policy is foremost "a contract between the insured and the insurer;" as the Supreme Court has held, "[i]n interpreting the contested terms of the insurance policy, we are bound by the rules established for the construction of contracts generally."  Henderson, 35 A.3d at 906, 908.  "It is well settled . . . that when the terms of an insurance policy are found to be clear and unambiguous judicial construction is at an end."  Nationwide Mut. Ins. Co. v. Viti, 850 A.2d 104, 106–07 (R.I. 2004) (internal citations omitted).  As a matter of contract law, the specific policy terms trump equitable considerations.  DiTata, 542 A.2d at 248.  Rhode Island's approach is consistent with the directive of the United States Supreme Court that federal courts interpreting contracts governed by state law must respect the importance of holding parties to a valid contract to the terms of their bargain.  Atl. Marine Constr. Co. v. U.S. Dist. Court, No. 12-929, slip op. at 9-11 (U.S. Dec. 3, 2013).

As in construing any contract, courts must be mindful of the settled expectations of the parties to an insurance policy; thus, the interpretation of an insurance agreement must be informed by the benefit to all parties from certainty and predictability, including in the setting of premiums.  See Century Indem. Co. v. Liberty Mut. Ins. Co., 815 F. Supp. 2d 508, 516 (D.R.I. 2011) (predictability and reduced premium rates are important public policy considerations).  For example, in Streicker, 583 A.2d at 554, the Rhode Island Supreme Court cited with approval the reasoning in Millers Casualty Insurance Co. of Texas v. Briggs, 665 P.2d 891 (Wash. 1983), where the Supreme Court of Washington upheld the validity of a UIM exclusion because the claimant had not paid a premium for UIM coverage.  As a result, there was no danger that the insurer would "gain a windfall if it is not forced to pay under both provisions of the policy." Streicker, 583 A.2d at 554 (internal citations omitted).

With these guiding principles in mind, I turn to the UIM statute and regulation in effect at the time of Mrs. Carpenter's accident.

R.I. Gen. Laws § 27–7–2.1(a) requires that every liability insurance policy issued in Rhode Island contain UIM coverage "in an amount equal to the insured's bodily injury liability limits," unless the insured affirmatively selects underinsured coverage lower than its liability coverage.  Porter v. Amica Mut. Ins. Co., 789 F. Supp. 2d 284, 287-88 (D.R.I. 2011) (quoting R.I. Gen. Laws § 27-7-2.1(a)).  The Regulations mandate that UIM coverage in an amount equal to the insured's selection for liability limits be afforded by the insurer.  See Rhode Island Department of Business Regulation ("DBR") Regulation 10 (Dec. 19, 2001).[8]  Moreover, the insured cannot select UIM coverage less than the statutory minimum for bodily injury liability,

---

[8] DBR Regulation 10 has since been amended.  The version applicable to Hartford's UIM coverage limit is discussed here.

see R.I. Gen. Laws §§ 31–31–7(a), 31-47-2(13)(i)(A), unless it selects the statutory minimum, in which case the insured can reject UIM coverage altogether.  R.I. Gen. Laws § 27-7-2.1(a).

When purchasing a new insurance policy, the selection of UIM coverage at a limit less than bodily injury coverage must be done by the insured "in writing" on a waiver form that enables the insured make an informed decision whether to request less coverage.  See R.I. Gen. Laws § 27-7-2.1(a); DBR Regulation 10 ("[i]f the insured elects to purchase coverage in an amount less than the liability limits . . . such election and/or rejection must be in writing on a form and/or forms utilized for this purpose").

When renewing or modifying an existing policy, the insurer must notify the insured of the option to purchase UIM coverage in amount equal to the bodily injury liability limits for the policy.  R.I. Gen. Laws § 27-7-2.1(d).  However, policy renewals require only that the insurer notify the insured of coverage available; the insurer is not required to secure a written rejection or selection form every time the policy is renewed or modified if the insured has already selected reduced UIM coverage in writing.  See Ferreira, 809 A.2d at 1101; see also Wagenmaker v. Amica Mut. Ins. Co., 601 F. Supp. 2d 411, 418 (D.R.I. 2009) ("a written rejection pursuant to § 27-7-2.1(a) is only required when the policy is initially issued, and not if a policy is being renewed, reinstated, substituted, amended, altered, modified, transferred, or replaced, as contemplated by § 27-7-2.1(d)"); Lynch v. Spirit Rent A Car, Inc., 2007 WL 868607, at *1 n.5 (R.I. Super. Ct. Feb. 27, 2007) ("when a new named insured is added to a pre-existing policy, in which uninsured/underinsured motorist coverage has already been rejected, there is no requirement that a second written rejection be obtained").

In construing these requirements, the Rhode Island Supreme Court has focused on the plain meaning of the words used by the General Assembly, mindful of the need to avoid an

interpretation that would impose an onerous burden on insurers.  See Ferreira, 809 A.2d at 1101.

Thus, if an insurer fails completely to provide notice of UIM coverage to the insured on renewal,

or fails completely to secure a written selection for reduced UIM coverage when issuing a new

policy, Rhode Island courts are not reluctant to reform the policy by writing UIM coverage into

it by operation of law in an amount equal to the policy's full coverage for bodily injury.  See

Fama v. Prudential Prop. & Cas. Ins. Co., 694 A.2d 741, 742 (R.I. 1997); Aetna Cas. & Sur. Co.

v. St. Angelo, 615 A.2d 1018, 1018 (R.I. 1992) (mem.).  Similarly, courts in other jurisdictions

have interpreted strictly the requirement that the insurance company must receive a written

selection from the named insured to lower UIM limits.  See Transguard Ins. Co. of Am., Inc. v.

Hinchey, 464 F. Supp. 2d 425, 436 (M.D. Pa. 2006) (e-mail from insurance broker, not insured,

requesting reduced UIM coverage fails to comply with statute); Nationwide Ins. Co. v.

Resseguie, 782 F. Supp. 292, 294 (M.D. Pa. 1992) (oral request from insured's husband fails to

establish knowledge by insured of lower coverage; insufficient to lower UIM coverage).  On the

other hand, the Rhode Island Supreme Court has resisted an interpretation of the UIM statute that

would result in equitable reformation of the insurance agreement as long as it correctly reflects

the prior completed understanding between insurer and insured.  Dubreuil v. Allstate Ins. Co.,

511 A.2d 300, 302-03 (R.I. 1986) (UIM construction should not "transform insurance from a

competitive industry into an industry dedicated entirely to the public welfare;" interpreting

earlier version of UIM statute).

 Consistently, the Rhode Island Supreme Court counsels that the interpretation of an

insurance agreement must begin with whether there is mutual consent.  Capuano v. Kemper Ins.

Cos., 433 A.2d 949, 953, 956 (R.I. 1981) (while insurer may not unilaterally cancel or modify

policy, cancellation is effective when premised on mutual consent).  If the court finds that there

was the required meeting of the minds, the intent of the insured to reject UIM coverage will be enforced when the insurer is changing an existing policy so that a written selection form is not required.  See Wagenmaker, 601 F. Supp. 2d at 417 (summary judgment on UIM coverage avoided due to fact issue regarding insured's intent).  Moreover, when the requirement of a written rejection is applicable, the Rhode Island Supreme Court has held that the insurer may interpret the insured's written intent to reject UIM as expressed on the application form.  daSilva v. Equitable Fire & Marine Ins. Co., 263 A.2d 100, 103 (R.I. 1970).

In daSilva, the insured was seeking UIM coverage, claiming that his completion of the application form with the assistance of his broker did not constitute a rejection of UIM coverage in a writing signed by him, as required by the operative version of the regulation, so that he should be able to access coverage at the full default limit.  Id. at 102-03.  The Supreme Court adopted a non-technical approach and found the agent's use of the words "Not Preferred" based on his conversation with the insured, coupled with the insured's signature on the back of the form, clearly imported his intent to reject UIM coverage.  Id.  In finding the rejection of UIM enforceable, the Court also found persuasive the fact that, in reliance on the plaintiff's intent to reject, the insurer did not charge, and plaintiff did not pay, any premium for UIM coverage.  Id.; cf. Wagenmaker, 601 F. Supp. 2d at 416-17 (to determine whether rejection of UIM effective, court looks to insured's intent, as well as compliance with UIM statute; where premium not reduced by UIM rejection and "fundamental dispute here as to whether the required meeting of the minds between [insured and insurer] occurred," summary judgment denied).

This Court may also consider well-reasoned decisions by courts in other jurisdictions. One such decision effectuated the meeting of the minds of the insurer and insured based on the undisputed intent of the insured to purchase the minimum limit of UIM coverage permitted by

law, despite an error in the selection form that rendered the insured's selection technically

contrary to law.  Melton v. Discover Prop. & Cas. Ins. Co., 760 F. Supp. 2d 633, 635 (W.D. Va.

2011).  In Melton, the court found that the insured's selection of the statutory minimum in UIM

coverage was effective even though the form misstated the law.  Id. at 637-38.  The court held

that the intent to reject combined with the act of rejection, albeit in words inconsistent with

applicable law, were sufficient under the statute.  Id. at 637.  Accordingly, "[s]ubstantial

compliance with the controlling UM/UIM coverage statutes, rather than hypertechnical

compliance, is all that is required."  Id.; see also Jefferson v. Harco Nat. Ins. Co., 3:08CV486,

2009 WL 1765670, at *8-9 (E.D. Va. June 18, 2009) (rejection of higher UIM limits enforceable

despite error in checking two inconsistent boxes on selection form because intent of parties was

clearly expressed in their communications, citing cases).

　　　　Several well-respected insurance law treatises confirm that, when there has been

compliance with the statutory requirement of completing a UIM selection form, but the form is

erroneous or ambiguous, the insured's intent should control in determining whether there has

been an effective selection of a lower limit of UIM coverage.  4 New Appleman Law of Liability

Insurance § 43.03[2] n.44 (Matthew Bender, Rev. Ed. 2013) (citing daSilva, 263 A.2d at 103, for

proposition that not all states require a high burden on insurers to prove rejection of UIM

coverage); 9 Couch on Insurance § 122:60 (mistake in checking box on coverage form does not

necessarily preclude conclusion that coverage was effectively rejected).  These commentators

suggest that emphasis on hypertechnical compliance is a useful tool only when there is a dispute

over intent.  Irwin Schermer & William Schermer, Automobile Liability Insurance § 38:25 n.190

(4th Ed. 2012) (citing Lightner v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 3:04-CV-184-RM,

2005 WL 1310674 (N.D. Ind. May 31, 2005)); but see 9 Couch on Insurance § 122:59 n.9 (citing

White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 913 F.2d 165 (4th Cir. 1990) (rejection

must be made on form regardless of intent), questioned by Jefferson, 2009 WL 1765670 (post-

White decisions have not followed its precedent and look to intent of the parties when insured

makes mistake on waiver form)).

In light of Quintiles' mistaken selection of a choice not legally available, despite its intent

to purchase the minimum limits permissible under Rhode Island law, the final rule of contract

interpretation applicable here is the hoary principle that encourages courts to construe contracts

to make them legal and enforceable instead of illegal and unenforceable.  See Walsh v. Schlecht,

429 U.S. 401, 408 (1977); Gay v. Burgess Mills, 74 A. 714, 717-18 (R.I. 1909); Citizens for

Pres. of Waterman Lake v. Davis, C.A. 75-1705, 1979 WL 200294, at *13 (R.I. Super. Ct. Apr.

27, 1979).  Consistent with this principle, this Court's interpretation should be guided by what

the parties were attempting to express – indeed, to overlook the parties' intended meaning in the

process of interpretation would be highly unjust.  5 Corbin on Contracts § 24.22 (Rev. Ed. 1998).

As the Restatement (Second) of Contracts § 203 summarizes: "In the interpretation of a promise

or agreement or a term thereof, the following standards of preference are generally applicable: . .

. an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is

preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. . . ."

## III.    ANALYSIS

### A.    Effectiveness of Quintiles' UIM Selection Form

A threshold issue not addressed by the parties is whether Hartford was required to

procure a written selection form from Quintiles at all.  It is undisputed that Quintiles was

renewing an existing policy.  ECF No. 16-1 at 2, 6; ECF 16-3 at 1-3.  Under R.I. Gen. Laws §

27–7–2.1(d), a renewal "requires an insurer to notify the policyholder(s) of the availability of

[UIM] coverage," but there is no requirement for a written selection of a lesser limit of UIM coverage when renewing a policy. Ferreira, 809 A.2d at 1101. Only when the policy is new is the insured required to select UIM coverage below its liability limits in writing on a waiver form "utilized for this purpose." R.I. Gen. Laws § 27-7-2.1(a); DBR Regulation 10. While the record does not specify that Quintiles was switching to Hartford from a different carrier or taking an action such that this "renewal" effectively amounted to the writing of a new policy, the parties agree that Hartford was required to obtain a selection form from Quintiles. Accordingly, I proceed on the premise that Hartford was required to obtain a selection form in writing from Quintiles in order to provide UIM coverage at limits less than the bodily injury liability limits of $2 million.

The legal effectiveness of Hartford's procurement of an imperfect selection form is the crux of this case. It is undisputed that Hartford fully and literally complied with the requirements of R.I. Gen. Laws § 27-7-2.1(a) in every respect except for its acceptance of an improperly-completed selection form. It is also undisputed that Hartford's interpretation of that incorrect form was consistent with Quintiles' intent to purchase the minimum amount of UIM coverage permissible by law and was reflected in the setting of the premium for a policy with minimal UIM coverage at the $75,000 limit. Thus, it is undisputed that there was a meeting of the minds between Hartford and Quintiles. It is significant that the box checked provided less coverage – Hartford's interpretation of the form provided for more coverage, consistent with Rhode Island law. Also significant is Quintiles' affirmation that Hartford's interpretation of its intent was accurate.

Plaintiffs argue that the Quintiles selection form is a legal nullity because it mistakenly selected rejection of all UIM coverage, a choice not permissible for Quintiles under Rhode Island

law in light of its bodily injury liability limit of $2 million.  To credit their argument would

require this Court to hold that a selection form with such an error amounts to no selection at all

and that an insurer may not interpret the selection form but must reject it when there is a mistake,

even though the error is obvious and the intent of its insured clear.  Having accepted and

correctly interpreted a form with a mistake, Plaintiffs contend that Hartford must pay the penalty

of being held responsible for the full default UIM coverage limit of $2 million.  Plaintiffs urge

this Court to adopt an interpretation that would impose an onerous burden on insurers – that they

must be hypertechnical in pursuit of a perfect UIM selection form or face the risk that the policy

will be reformed to provide maximum UIM coverage despite a premium set for the minimum

limit based on a meeting of the minds.

      While Plaintiffs' position would satisfy the public policy of making whole the victims of

underinsured motorists, it otherwise runs contrary to the policy guidance from the Rhode Island

Supreme Court.  See LaFlam, 69 A.3d at 835 (goal of UIM statute to protect insurers from

unwarranted claims); Henderson, 35 A.3d at 906 (courts must construe UIM statute in a manner

that affords insurers some financial protection); Ferreira, 809 A.2d at 1101 (courts should avoid

interpretation that would impose an "arguably onerous burden on insurers").  It flies in the face

of the holding that UIM endorsements must be interpreted in light of the benefit to all parties

from certainty and predictability, including in the setting of premiums.  Streicker, 583 A.2d at

554; see Century Indem. Co., 815 F. Supp. 2d at 516.  It ignores the Rhode Island Supreme

Court's consistent emphasis on contract principles, including due respect for the intent of the

parties.  See Dubreuil, 511 A.2d at 302-03; Capuano, 433 A.2d at 956; daSilva, 263 A.2d at 103.

It is inconsistent with the well-reasoned holding of the federal court in the Western District of

Virginia in Melton, which examined a selection form with a similar error.  760 F. Supp. 2d at

18

637-38 (when intent is undisputed, substantial compliance, rather than hypertechnical compliance, is what is required); see also Jefferson, 2009 WL 1765670, at *7-9 (ambiguous selection form, with two inconsistent boxes checked, may be interpreted based on unambiguous intent of insured).  Analogous cases from other jurisdictions that ignore intent and impose a hypertechnical UIM selection requirement do not focus on the public policy considerations that the Rhode Island Supreme Court has held must be considered here.  See Lightner, 2005 WL 1310674, at *5 (UIM selection form that erroneously mentions coverage limit below what is legally permissible held void; no reference to policy of protecting insurers from onerous burdens and financial unpredictability); Jordan v. Allstate Ins. Co., 245 P.3d 1214, 1219-21 (N.M. 2010) (strong statutory preference for maximum UIM coverage requires strict construction to protect insured; court strikes balance between these statutory goals and freedom of contract by adding onerous retrospectively applicable requirement that carriers must provide insured with premium costs of each level of stacked coverage).

Plaintiffs make much of the legal impermissibility of the choice marked on the Quintiles selection form.  For this Court to find that such a selection error renders the form a nullity, it must ignore various well-settled principles of contract construction, starting with the rule encouraging courts always to employ the interpretation that gives a reasonable, lawful and effective meaning to the terms.  Restatement (Second) of Contracts § 203; see Walsh, 429 U.S. at 408; Gay, 74 A. at 717-18.  Plaintiffs' argument also requires this Court to disregard what the parties were attempting to express, including the insured's clearly expressed intent to comply with the law.  See 5 Corbin on Contracts § 24.22 (to overlook parties' intended meaning in process of interpretation would be highly unjust).  Consistent with cases from other jurisdictions, the better course is for the court to "[erase a] defect in the rejection" when the intended selection

is clear.  Ins. Co. of N. Am. v. MacMillan, 945 F.2d 729, 731-32 (4th Cir. 1991); Jefferson, 2009 WL 1765670, at *8-9.

Plaintiffs' argument rests on the plain language of R.I. Gen. Laws § 27-7-2.1(a) and Regulation 10.  However, neither contains the words they need.  R.I. Gen. Laws § 27-7-2.1(a) requires the named insured to select UIM coverage below bodily injury liability coverage in writing.  Regulation 10 mandates that the selection or rejection of UIM coverage must occur on a form "utilized for this purpose."  Quintiles and Hartford literally complied with these requirements.  Quintiles communicated in writing, both in its Policy Submission and based on the selection made on the Supplemental Application form, its intent to procure either no underinsured motorist coverage or the statutory minimum.  Hartford sent, and Quintiles used, "a form . . . utilized for this purpose."  Hartford boosted Quintiles' limit to $75,000 in UIM coverage because it was aware of Quintiles' intent to comply with state law while purchasing the minimum.  This accurate interpretation of its insured's intent undisputedly resulted in a meeting of the minds.  The statute and regulation do not preclude the insurer from interpreting its insured's intent, however unartfully expressed on the selection form.[9]  See daSilva, 263 A.2d at 103.

A final consideration is the Rhode Island Supreme Court's emphasis on respecting the plain meaning of insurance contracts.  Here the insurance agreement that resulted from the meeting of the minds between Hartford and Quintiles is unambiguous – the endorsement in Form HA2102 is crystal clear in setting the UIM coverage at a $75,000 combined single limit.  Where

---

[9] Of course, the insurer engages in such interpretation of the selection form at its own risk.  If it does not correctly interpret a selection form returned by the insured with an erroneous selection, it faces the prospect that the policy might be reformed to the maximum amount of UIM coverage.  Put differently, to protect itself from its insured's change of heart or a swearing contest over the insured's actual intent, it must procure an unambiguous selection form directly from its insured.  See Hinchey, 464 F. Supp. 2d at 436 (email from broker, not from insured, insufficient to lower UIM limit); Resseguie, 782 F. Supp. at 294 (insurer's acceptance of oral request for lower limits from husband of insured, with no evidence of knowledge of request or intent to set lower limits from insured herself, results in reformation of policy to maximum UIM limit).

Hartford literally complied with the operative statute and regulations, and correctly implemented its insured's intent, this Court should not reform the policy to provide for a different limit.  See Viti, 850 A.2d at 106-07 (R.I. 2007) ("It is well settled . . . that when the terms of an insurance policy are found to be clear and unambiguous judicial construction is at an end.") (quoting Dellagrotta v. Liberty Mut. Ins. Co., 639 A.2d 980, 980 (R.I. 1994)); Malo v. Aetna Cas. & Surety Co., 459 A2d 954, 956 (R.I. 1983) (insurance policies must be applied as written). Accordingly, I recommend that this Court hold that an insurer may interpret the UIM selection form, and as long as its interpretation is consistent with its insured's intent, the resulting UIM coverage limit will be judicially enforced.

**B.**      **Timeliness of Hartford's Notice of UIM Options**

Plaintiffs argue that, because Quintiles was undisputedly seeking a renewal, Hartford violated R.I. Gen. Laws § 27-7-2.1(d) because it did not notify Quintiles of its UIM coverage options, including the availability and advisability of purchasing full UIM coverage of $2 million, until after the effective date (April 1, 2007) of the policy.[10]  As a result of the undisputed delivery of the notice after the effective date, Plaintiffs argue that this Court should reform the UIM coverage to be equal to the bodily injury liability limits of $2 million.  See Fama, 694 A.2d at 742 (lack of notification of right to select lower UIM coverage results in reformation of policy to full bodily injury coverage).

This argument is unavailing.  The timing of the notice is not material as long as it was mailed a reasonable period of time before the event triggering coverage.  Porter, 789 F. Supp. 2d

---

[10] Plaintiffs also rely on DBR Regulation 10 for the proposition that "[t]he insurance company must offer [UIM] bodily injury limits equal to the bodily injury limits in the policy."  See ECF No. 12 at 7.  This argument is misplaced because it relies on language that was added to DBR Regulation 10 after the operative events occurred in this case.  See DBR Regulation 10 (Dec. 19, 2012).  The version of DBR Regulation 10 applicable to this case required only that "[c]overage . . . shall be afforded in an amount equal to the insured's liability limits."  DBR Regulation 10 (Dec. 19, 2001).  Hartford complied with this requirement.

at 290 (since insured can change coverage at any time, timeliness of notice not critical if mailed a reasonable time prior to accident); Bordelon v. W. Heritage Ins. Co., 48 So. 3d 421, 428 n.11 (La. Ct. App. 2010) (rejection of UIM valid when made before accident, rejection may occur after issuance of policy); see also 9 Couch on Ins. § 122:55 (rejection of underinsured motorist coverage can occur after policy is issued).  Here, whether this Court accepts Plaintiffs' mailing date of May 22, 2007, or Hartford's mailing date of April 3, 2007, it remains undisputed that a notice that conformed to the requirements of R.I. Gen. Laws § 27-7-2.1(d) was sent to Quintiles before August 22, 2007, the date of the accident.  Accordingly, Plaintiffs' argument that they are entitled to summary judgment based on the timing of the notice sent pursuant to R.I. Gen. Laws § 27-7-2.1(d) is without merit; rather, the undisputed facts establish that Hartford's notice was mailed within a reasonable time prior to Mrs. Carpenter's accident in compliance with Rhode Island law.

## IV.    CONCLUSION

Based on the foregoing, I recommend that Plaintiffs' Motion for Partial Summary Judgment (ECF No. 11) be denied and Hartford's Motion for Summary Judgment be granted (ECF No. 15).

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days after the date of service.  See Fed. R. Civ. P. 72(b).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 10, 2013